Alexander K. Obrecht
(Wyoming Bar No. 7-5542)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
aobrecht@bakerlaw.com

Martin T. Booher
*(pro hac vice forthcoming)*
Joshua T. Wilson
*(pro hac vice forthcoming)*
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114

*Counsel for Petitioners*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

WESTMORELAND MINING HOLDINGS LLC, WESTMORELAND MINING LLC, WESTMORELAND ROSEBUD MINING LLC, AND WESTMORELAND HAYSTACK MINING, LLC,

<div style="margin-left:2em">*Petitioners,*</div>

<div style="margin-left:2em">v.</div>

U.S. DEPARTMENT OF THE INTERIOR; SECRETARY OF THE INTERIOR, IN HIS OFFICIAL CAPACITY; BUREAU OF LAND MANAGEMENT; DIRECTOR OF THE BUREAU OF LAND MANAGEMENT IN HIS OFFICIAL CAPACITY; ANDREW ARCHULETA, IN HIS OFFICIAL CAPACITY AS THE WYOMING STATE DIRECTOR FOR THE BUREAU OF LAND MANAGEMENT; SONYA GERMANN, IN HER OFFICIAL CAPACITY AS THE MONTANA/DAKOTAS STATE DIRECTOR FOR THE BUREAU OF LAND MANAGEMENT,

<div style="margin-left:2em">*Respondents.*</div>

Case No. _____

## PETITION FOR JUDICIAL REVIEW OF AGENCY ACTION

The Powder River Basin in Wyoming and Montana produces over 40% of all coal produced in the US, and 85% of all coal produced on federal land. Not only is this area critical

to domestic energy security, but the coal in this area is also the absolute most cost friendly source of low-sulfur, sub-bituminous coal, which a significant number of electricity generating units (EGUs) are required to use to meet sulfur limits imposed under multiple EPA regulatory regimes such as the EPA Cross State Air Pollution Rule and Regional Haze Rule.

Notwithstanding the importance of coal to this region, the Bureau of Land Management issued a ban on all federal coal leasing in the Powder River Basin to achieve the Biden administration's political objective of forcing a rapid shift to 100% carbon-free electricity by 2035, and eliminating all carbon emissions by 2050.

BLM has no statutory authority, let alone expertise, to force a restructuring of the nation's energy market, and its attempt to do so violates the Major Questions Doctrine. Yet the 2024 Records of Decision and Approved Resource Management Plan Amendments for the Buffalo Field Office (Buffalo ARMPA) and Miles City Field Office (Miles City ARMPA) challenged in this petition attempted just that by jointly denying all pending lease applications and banning all future leases in the entirety of the Powder River Basin, citing, as a pretense, a purported lack of future demand for coal. In the process, BLM violated many statutes, including the Federal Land Policy and Management Act (FLPMA), the National Environmental Policy Act (NEPA), the Mineral Leasing Act (MLA), the Surface Mining Control and Reclamation Act of 1977 (SMCRA), the Fiscal Responsibility Act (FRA), and BLM's own regulations regarding Resource Management Planning (43 C.F.R. Part 1600 Subpart 1610), and that is on top of the ARMPAs and their underlying rationales being arbitrary and capricious in violation of the Administrative Procedure Act (APA) and the Due Process Clause.

This Court should reverse the Buffalo and Miles City ARMPAs as unlawful, arbitrary, and capricious.

## JURISDICTION AND GROUNDS FOR RELIEF

1.     This Court has jurisdiction under 28 U.S.C. §1331 because the claims presented in this Petition arise under federal law and 5 U.S.C. §§702 and 706, which waive sovereign immunity. An actual controversy exists between the parties within the meaning of 28 U.S.C. §2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§2201-02, 5 U.S.C. §§705-06, and its inherent equitable powers. The claims presented arise under FLPMA, NEPA, MLA, SMCRA, FRA, the APA, BLM regulations, and the U.S. Constitution.

2.     Venue is proper in this Court under 28 U.S.C. §1391(e) for the following independent reasons:

    a.   multiple Defendants reside within the District of Wyoming, including the Bureau of Land Management which has established an office in multiple locations in Wyoming, including at 1425 Fort Street Buffalo, WY 82834-2436,

    b.   a substantial part of the events or omissions giving rise to the claim occurred in Wyoming; and

    c.   all the land subject to the Buffalo ARMPA is situated in the District of Wyoming.

3.     Petitioners challenge the Respondents' decision to adopt the No Leasing Alternative in the Miles City and Buffalo ARMPAs.

4.     The Buffalo ARMPA is a reviewable final agency action.

5.     The Miles City ARMPA is a reviewable final agency action.

6.     The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2).

## PARTIES

7.     Petitioners Westmoreland Mining Holding LLC, Westmoreland Mining LLC, Westmoreland Rosebud Mining LLC, and Westmoreland Haystack Mining, LLC (collectively, "Westmoreland") own and operate the Absaloka and Rosebud Mines within the Miles City Field Office's boundaries. The Rosebud Mine is a mine-mouth operation that provides coal to the Colstrip Power Plant. Westmoreland's current mining plans anticipate a reasonable potential to require new federal coal leases to continue operations through the useful life of the Rosebud Mine. Further, Westmoreland's ability to develop its existing coal leases depends on the ability to obtain new federal leases. The ARMPAs' closing of all new federal coal leases directly impairs Westmoreland's interest in providing the Colstrip Power Plant and other current and future customers with cost-efficient and clean-burning fuel to provide electricity to the community, state, and beyond. The ARMPAs also imperil Westmoreland's interest in continuing to provide stable, high-paying jobs to its employees and contractors. Furthermore, Westmoreland also owns mining interests in Wyoming, including the Haystack mine, and the ARMPAs imperil Westmoreland's ability to expand operations in both Wyoming and Montana as needed for business development. A favorable ruling from this Court that invalidates the ARMPAs would redress the harm caused to Westmoreland by the agency actions.

8.      Respondent United States Department of the Interior (DOI) is a federal executive department. Department officials help the Secretary develop, implement, and enforce the Secretary's policies and decisions, including the decisions challenged in this petition.

9.      Respondent Secretary of Interior implements oil, gas, and coal development on federal lands in accordance with federal law and is responsible for the decisions of the Department of the Interior. The current Secretary of Interior is Doug Burgum, who succeeded former secretary Deb Haaland who was the Secretary of Interior at the time of the events underlying this Petition. The Secretary of Interior is sued in his official capacity.

10.     Respondent Bureau of Land Management (BLM) is an agency within the United States Department of the Interior. It manages approximately 245 million acres of federal public lands in the United States. BLM is the agency responsible for promulgating the challenged Buffalo ROD and ARMPA and the Miles City ROD and ARMPA.

11.     Respondent Director of the Bureau of Land Management is responsible for the decisions of the Bureau of Land Management. At the time this Petition was filed, the position of Director of the Bureau of Land Management is temporarily vacant due to the resignation of former Director Tracy Stone-Manning on January 13, 2025 to join the Wilderness Society. Former Director Stone-Manning was the Director of the Bureau of Land Management at the time of the events underlying this Petition, and the new administration has not yet appointed a replacement. The Director of the Bureau of Land Management is sued in their official capacity.

12.     Respondent Andrew Archuleta is the Wyoming State Director for BLM. Director Archuleta is responsible for overseeing management of BLM lands in Wyoming. Director Archuleta is sued in his official capacity.

13.     Respondent Sonya Germann is the Montana/Dakotas State Director for BLM. Director Germann is responsible for overseeing management of BLM lands in Montana. Director Germann is sued in her official capacity.

## STATUTORY BACKGROUND

14.     The management of public lands is guided by several federal statutes, including FLPMA, NEPA, SMCRA and the MLA. FLPMA authorizes BLM to develop formal resource management plans and prescribes what BLM must consider when developing those plans. Because those plans constitute major federal actions affecting public lands, NEPA further instructs BLM on specific factors it must consider when developing those plans. Because the specific plans in this case involve coal leasing, the MLA provides even more guardrails within which the agency must develop those plans. And because the specific plans in this case designate a land area as unsuitable for surface coal mining operations, SMCRA imposes still further requirements on factors and analyses BLM must consider.

15.     To address these statutory obligations, after some initial public engagement, the agency first creates a Draft Supplemental Environmental Impact Statement (SEIS) and a Potential Resource Management Plan (RMP) based on that Draft SEIS. After further review and public engagement, the agency creates a Final SEIS and Proposed RMP, which represents the agency's near-final decision on how to manage that portion of public lands. After one final period of review, the agency issues a Record of Decision (ROD), in which it formally approves a final RMP. Petitioners describe below how those processes unfolded for

both the Buffalo and Miles City ARMPAs in their joint determination to ban all coal development in the Powder River Basin.

## I. The Federal Land Policy and Management Act of 1976

16.    As explained, FLPMA authorizes BLM to develop RMPs that guide the management of public lands administered by BLM.

17.    FLPMA's overarching command is that the "Secretary shall manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. §1732(a)(7). Consistent with that command, BLM develops RMPs that serve as land management blueprints and provide guidance for exactly how the public lands will be managed.

18.    FLPMA defines "multiple use" as managing "public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people." *Id.* §1702.

19.    FLPMA further orders that public lands "be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands." *Id.* §1732(a)(12).

20.    Congress defined the term "sustained yield" as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." *Id.* §1702(h).

21.    FLPMA also authorizes the Secretary of the Interior to "withdraw" federal lands, but *only* in certain circumstances and *only* after following specific procedural safeguards. 43 U.S.C. §§1701, 1714. Under FLPMA, "withdrawal" means "withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws." 43 U.S.C. §1702. Any withdrawal over 5,000 acres can only be withdrawn for a

"period of not more than twenty years" and requires advance notice and detailed report to both Houses of Congress, which must then have an opportunity to disapprove the proposed withdrawal. 43 U.S. Code § 1714(c).

22.     A withdrawal of mineral leasing falls within FLPMA's definition of a "withdrawal." *Mountain States Legal Found. v. Hodel*, 668 F. Supp. 1466, 1474 (D. Wyo. 1987).

## II. National Environmental Policy Act

23.     NEPA prescribes the process by which federal agencies analyze the environmental impact of proposed agency actions, including resource management plans.

24.     NEPA requires that the agency develop a "detailed statement" including, among other things, "reasonably foreseeable environmental effects of the proposed agency action" and consideration of "a reasonable range of alternatives to the proposed agency action" which must also include consideration of a "no-action" alternative. 42 U.S.C. § 4332(C).

25.     To comply with NEPA, agencies may prepare an Environmental Impact Statement (EIS), which is a comprehensive document examining the impacts of a federal action on the environment.

26.     Under NEPA, if the agency prepares an EIS but then the agency decides to change its proposed action or new circumstances arise, an agency may issue a Supplemental Environmental Impact Study (SEIS) where those changes or new circumstances "would result in significant environmental impacts that were not evaluated in the EIS." 23 C.F.R. §771.130(a).

27.     NEPA is not outcome determinative and "the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v.*

*Methow Valley Citizens Council*, 490 U.S. 332, 351-52 (1989). Instead NEPA is meant to ensure "that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.* at 349.

### III.     Mineral Leasing Act

28.     The MLA, as amended, authorizes the development of mineral deposits on federal lands. 30 U.S.C. §181. It governs the leasing of public lands for the extraction of these minerals, including coal. A resource management plan incorporates these requirements and provides specific guidance for where and how these mineral leases can be issued in a specific area consistent with the MLA.

29.     The MLA provides that "[d]eposits of coal, phosphate, sodium, potassium, oil, oil shale, gilsonite …, or gas, and lands containing such deposits owned by the United States, … shall be subject to disposition" under the MLA's requirements. *Id.*

30.     The MLA's purpose is "[t]o promote the mining of coal, phosphate, oil, oil shale, and sodium on the public domain." Act of Feb. 25, 1920, ch. 85, §32, 41 Stat. 437. It was enacted "to obtain for the public reasonable financial returns on assets belonging to the public." *Mountain States Legal Found. v. Andrus*, 499 F. Supp. 383, 392 (D. Wyo. 1980).

31.     The MLA authorizes the Secretary to divide lands into leasing tracts "which will permit the mining of all coal which can be economically extracted in such tract." 30 U.S.C. § 201.

32.     The MLA directs the Secretary that "he shall, in his discretion…offer such lands for leasing and shall award leases thereon by competitive bidding." 30 U.S.C. § 201.

33.    The MLA further directs the Secretary to "reserv[e] and offe[r]" a reasonable number of leasing tracts to public bodies. 30 U.S.C. § 201.

34.    Amendments to the MLA reinforce these federal policies. The Mineral Leasing Act for Acquired Land of 1947 made millions of new acres available for federal coal leasing. 30 U.S.C. §§ 351-52. And the Federal Coal Leasing Amendments Act of 1976 were adopted to protect federal coal leasing as part of the multiple-use land use planning process.

### IV. The Surface Mining Control and Reclamation Act of 1977

35.    SMCRA regulates the environmental effects of coal mining, both for active coal mining and regarding reclamation of abandoned mines.

36.    As relevant here, SMCRA requires that prior to designating a land area as unsuitable for surface coal mining operations, the regulatory authority must prepare a detailed statement on (i) the potential coal resources of the area, (ii) the demand for coal resources, and (iii) the impact of such designation on the environment, the economy, and the supply of coal. 30 U.S.C. § 1272(d).

### V. Other Relevant Federal Provisions

37.    Before BLM issues any coal-extraction lease, any lands potentially subject to such a lease must be screened by BLM, which means BLM must determine whether potential federal coal lands are suitable for leasing. The screening can be done as part of BLM's development of the RMP, or the site's NEPA analysis, or some combination of the two.

38.    BLM's coal screening regulations establish certain steps that BLM must take to fully screen the land. 43 C.F.R. § 3420.1-4(e). Screen 1 requires BLM to identify coal with potential for development. Screen 2 requires BLM to determine if any of the identified land is unsuitable for coal development. Screen 3 requires BLM to consider multiple-use conflicts.

And Screen 4 requires BLM to consult with specific surface owners. BLM must consider each of these as part of assessing what lands are available for federal coal leasing in the planning area, which is the area subject to the resource management plan. 43 C.F.R. § 3420.1-4(e).

39.     The agency must identify coal with the potential for development, determine if the lands are unsuitable for coal development, consider multiple use, and consult with specific surface owners. *Id.*

40.     Since 1982, BLM's Department Policy has been to "keep public lands open to mineral exploration and development." *See* BLM Manual 3031.06.A; U.S. Department of the Interior's National Materials and Minerals Program Plan and Report to Congress (April 1982).

41.     BLM prepared an Energy and Mineral Resource Assessment Manual, which ensures that mineral resource assessment "constitutes one part of the Geology, Energy, and Mineral (GEM) resources input into land-use decisions." BLM Manual 3031.01.

42.     Congress' statutory frameworks prescribe these processes by which BLM must evaluate—and the public can provide input into—when and how coal extraction occurs on federal public lands. Consistent with both FLPMA and NEPA, the agency solicits public input, engages with the relevant State and its agencies, and develops draft proposals in the form of a proposed RMP and a draft EIS. These proposals consider concerns raised by the States, industry, and the public, and aim to work in conjunction with state and local laws, policies, and plans and to ensure responsible development of mineral resources. As part of this process, the agency also evaluates its multiple-use objectives and environmental impacts by conducting certain analyses, including a coal screen. Once the agency has addressed all the concerns and resolved any inconsistencies, it issues a ROD, which represents the final

decision of the agency on how it will manage federal public lands in the area covered by the RMP.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Powder Riven Basin

43.     The Powder River Basin is located in northeast Wyoming and southeast Montana.

44.     The Powder River Basin alone accounts for 85% of all coal produced on federal land, and 40% of all coal produced in the United States. In Fiscal Year 2022, development of federal coal resources provided nearly $550,000,000 in revenue to the federal government.

45.     BLM issued two RMPs to jointly manage the Powder River Basin: (1) the Buffalo ARMPA, which applies to the federal land in the Wyoming part of the Powder River Basin; and (2) the Miles City ARMPA, which applies to the Montana part of the Powder River Basin.

46.     The Buffalo ARMPA covers 481,000 acres of subsurface federal mineral coal estate with 48.12 billion short tons of unleased recoverable federal coal. *See* Buffalo Record of Decision and Approved RMPA, BLM (Nov. 27, 2024) (docket available at https://eplanning.blm.gov/eplanning-ui/project/2021239/570).

47.     The Miles City ARMPA covers approximately 2.7 million acres of BLM-administered surface land and 11.7 million acres of subsurface federal mineral estate in 17 eastern Montana counties. *See* Miles City Record of Decision and Approved RMPA, BLM, at 1-1 (Nov. 27, 2024) (Nov. 27, 2024) (docket available at https://eplanning.blm.gov/eplanning-ui/project/2021155/570).

48.     Coal mining in this area is essential to the power plants, communities, and states that all rely on coal mining activities in this region.

49.     Coal capacity is anticipated to remain on the grid for the full foreseeable future, requiring continued and reliable access to sufficient coal for decades to come. Unlike BLM's RMPAs, EPA's recent New Source Performance Standards and Clean Air Act section 111(d) emission standards for greenhouse gasses from fossil fuel fired power plants included an analysis of energy needs and grid adequacy to assess anticipated impacts of that rulemaking. That Resource Adequacy report projected that even after stringent GHG emission standards are in effect, "long-term equilibrium level of remaining coal capacity" will continue past 2040.

50.     Furthermore, as BLM acknowledged in the FSEISs and RMPAs, Global coal markets are expected to remain steady or possibly see an increase largely due to increasing demand in Asia.

51.     By BLM's own estimates, the Spring Creek and Rosebud Mines (both within the area withdrawn by the RMPAs) are forecasted to produce 13,548,009 tons of coal in 2038, the majority of which—9,231,578 tons—would come from federal leases.

52.     Westmoreland owns and operates the Absaloka and Rosebud Mines within the Miles City Field Office's boundaries. The Rosebud Mine provides coal to the Colstrip Power Plant. The Colstrip Power Plant is inextricably tied to Rosebud coal, both because it is limited by permit to use only coal from Rosebud (for multiple reasons, including quality specifications of that coal and the mine-mouth nature of Colstrip), and because Colstrip's power plant units 3 and 4 were specifically designed to run on Rosebud coal, such that any change would be technically infeasible and threaten the ability to comply with permit, regulatory, and production efficiency requirements. Accordingly, any disruption to Rosebud's ability to fully

supply Colstrip due to any hinderances to obtaining leases, directly threatens the continued operation of the Colstrip Power Plant.

53.    As discussed in detail in the Barkey Report (provided to BLM in Westmoreland's protest letter), a closure of the Rosebud mine would be devastating for the State of Montana. Among other things, premature closure would lead to a Montana economy that:

    a.  Loses over 1,800 jobs, with an average earnings per year exceeding $62,000;

    b.  Experiences a shortfall of more than $40 million in state government revenue; and

    c.  Faces a loss of revenue to business in excess of $330 million per year.

54.    BLM's forecast in the ARMPA's that Rosebud Mine's existing reserves will last until 2060 is wildly theoretical and contradicts Westmoreland's data. At best it appears that BLM has considered only the total coal anticipated to be in the ground, and even if that estimate were reliable, has not accounted for the relevant factors that actually determine the feasibility of mining ever sparser coal seams, including strip ratios, differences in quality of coal remaining, and cost effectiveness. For example, Westmoreland's data indicates known reserves will be sufficient into the 2030s, but any further existing reserves may not be of the requisite quality or strip ratios, such that Westmoreland cannot guarantee being able to meet demand at necessary cost and quality constraints past the 2030s absent the future availability of potential additional leases should they become necessary.

55.    Under the ARMPAs, Spring Creek mine would exhaust its existing reserves by 2035. Thus, while there would be a demand for additional coal, there would be no federal

coal available to lease, and BLM acknowledged this would likely also make it infeasible to develop surrounding non-federal reserves. As BLM acknowledged, the Spring Creek Mine, having limited options to expand without new federal leases, would likely be forced by these ARMPAs to close by 2035.

56.     Westmoreland also owns mining interests in Wyoming, including the Haystack mine. The ARMPAs imperil Westmoreland's ability to expand operations in both Wyoming and Montana as needed, including to maintain optionality in coal reserves and to meet future business development demands.

***Western Organization of Resource Councils Litigation (WORC I and II)***

57.     In 2015, BLM issued one Record of Decision that approved both the Miles City and Buffalo Field Office RMPs. *See* Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region, Dep't of Interior (Sept. 2015), (available at https://eplanning.blm.gov/public_projects/lup/105596/143663/176863/2015_Rocky_ Mountain_Region_Record_GRSG_ROD_ARMPA_508.pdf). For the Buffalo Field Office, BLM selected an alternative which continued to permit mineral leasing on federal land. BLM determined that "it best achieve[d] the mix of multiple uses" because it placed some constraints on resources uses while still permitting leasing. *Id*. at 3-16. For the Miles City Field Office, BLM selected an alternative which permitted resource uses (e.g., energy and mineral development and other commodity uses) while providing protection to sensitive resources like the Greater Sage-Grouse habitat. *Id*. at 3-19. BLM determined that the selected alternative "provided the most balanced approach to multiple-use and sustainability of BLM-administered lands while offering a high degree of resource protection in sensitive areas." *Id*.

58.    Environmental groups sued under NEPA, arguing that BLM—among other things—failed to consider adequate alternatives, failed to look at the indirect impacts of combustion emissions, failed to consider greenhouse gas emissions, and failed to look at the cumulative impacts. Am. Compl., *W. Org. of Res. Councils v. BLM*, cv-16-21-GF-BMM, Doc. 66 (D. Mont. Mar. 31, 2017) (WORC I).

59.    In 2018, the Montana federal district court determined that BLM violated NEPA. It directed BLM to prepare a supplemental EIS for both management plans and ordered that any new or pending leases of coal in those two areas must undergo comprehensive environmental analyses. The Court, however, expressly chose not to vacate the 2015 ROD, leaving it in place as the governing RMP and baseline for future proceedings. Order, *W. Org. of Res. Councils v. BLM*, cv-16-21-GF-BMM, Doc. 124 (D. Mont. July 31, 2018).

60.    In 2019, BLM completed each supplemental EIS and approved Resource Management Plan Amendments. *See* Buffalo 2019 ROD, *W. Org. of Res. Councils v. BLM*, 4:20-cv-76, Doc. 25-2 (D. Mont. Jan. 11, 2021) (WORC II); Buffalo 2019 FSEIS, WORC II, Doc. 25-3; Miles City 2019 ROD, WORC II, Doc. 25-5; Miles City 2019 FSEIS, WORC II, Doc. 25-6. The Buffalo ARMPA approved Alternative B, which permitted the expansion of existing mines and provided an opportunity for future new uses of coal. The Miles City RMPA likewise approved Alternative B, which "provide[d] the best balance of resource conservation, while not foreclosing future opportunities for development." Miles City 2019 ROD at 1-4.

61.    In BLM's 2019 Buffalo FSEIS, BLM recognized that additional coal leasing was needed. The agency acknowledged that "[m]aking the entire decision area unacceptable

for further consideration for coal leasing" would not satisfy FLPMA or MLA. Buffalo 2019 ROD at 1-2.

62.     In BLM's 2019 Miles City FSEIS, BLM likewise recognized the importance of retaining opportunities for future development, selecting Alternative B over Alternative C (which identified fewer acceptable acres for the purposes of reducing greenhouse gas emissions) because it provided a better "balance of resource conservation" while retaining "future opportunities for development." Miles City 2019 ROD at 1-4.

63.     A nearly identical group of environmental plaintiffs sued again, asserting that BLM failed to consider alternatives that would result in less coal development and failed to consider air pollution. Second Am. Compl., *W. Org. of Res. Councils v. BLM*, 4:20-cv-76, Doc. 37 (D. Mont. Mar. 30, 2021). As summary judgment briefing neared conclusion, BLM requested that the district court remand the agency's decision without vacatur so that BLM could undertake new supplemental analyses and re-examine the challenged decisions. Notice of Intent to Move for Remand, *W. Org. of Res. Councils v. BLM*, 4:20-cv-76, Doc. 60 (D. Mont. Feb. 25, 2022).

64.     The district court acknowledged that district courts "generally grant an agency's request for remand," particularly when—as in WORC II—the agency claims that it will address the deficiencies in Plaintiffs' claims. Order, *W. Org. of Res. Councils v. BLM*, 4:20-cv-76, Doc. 71, at 8 (D. Mont. Aug. 3, 2022). The district court nevertheless denied BLM's request, in part, because BLM made "no specific guarantees to consider downstream emissions in its motion" and failed "to define what NEPA alternatives it [would] consider." *Id*. at 10. The Court's denial of remand without vacatur in in WORC II necessarily continued to leave the 2015 ROD in place as the most recent non-vacated ROD.

65.    The district court then determined that because the Council on Environmental Quality's regulations required BLM to consider "indirect" environmental effects and to evaluate additional alternatives, BLM needed to complete a new coal screening and NEPA analysis. Order, *W. Org. of Res. Councils v. BLM*, 4:20-cv-76, Doc. 71, at 10-19 (D. Mont. Aug. 3, 2022) (citing 40 C.F.R. § 1502.14(a) and 40 C.F.R. § 1502.16(b)). These regulations have since been declared invalid. *See Marin Audubon Soc'y v. FAA*, --F.4th ---, 2024 WL 4745044 (D.C. Cir. Nov. 12, 2024).

66.    Finally, unsatisfied with BLM's second NEPA analysis, the district court required the agency to undertake a new NEPA analysis yet again. The court specifically instructed BLM to consider both a no coal leasing and limited coal leasing alternative. Order, *W. Org. of Res. Councils v. BLM*, 4:20-cv-76, Doc. 71, at 20 (D. Mont. Aug. 3, 2022). The district court also specified that BLM must disclose climate and non-climate health impacts of burning fossil fuels as part of its NEPA review. *Id*.

**Development of the Buffalo ARMPA Challenged in this Case**

67.    BLM published its notice of intent (NOI) and began the scoping period for the Buffalo Draft SEIS/Potential RMPA on October 3, 2022. 87 Fed. Reg. 59818.

68.    In December 2022, the Buffalo Field Office issued its Final Scoping Report, which summarizes the public input gathered during the scoping period and identifies potential issues that need to be analyzed further.

69.    In May 2023, the Buffalo Field Office issued a Draft SEIS and Potential RMPA. 88 Fed. Reg. 29691 (May 8, 2023); *see also* Buffalo Draft SEIS and Potential RMPA, BLM (May 2023) (available in BLM docket at https://eplanning.blm.gov/eplanning-ui/project/2021239/570).

70.    In the Draft SEIS and Potential Buffalo RMPA, BLM considered three alternatives to manage 481,000 acres of Coal Development Potential Area (CDPA). This area contains 4.36 billion short tons of leased, unmined, recoverable coal and 48.12 billion short tons of unleased recoverable federal coal.

71.    Alternative A was the No Leasing Alternative, which does not allow BLM to accept new coal lease applications. It results in the CDPA being unacceptable for future consideration of federal coal leasing. Put more simply: it eliminates future coal leasing in the Powder River Basin.

72.    Alternative B, which BLM represented to be the No Action Alternative, was a copy of the Alternative selected in the vacated 2019 ROD, which would make 48.01 billion short tons of BLM-administered recoverable coal available for future leasing.

73.    Alternative C was a Limited Leasing Alternative, which would make 1.24 billion short tons of BLM-administered recoverable coal available for future leasing. But the remaining recoverable coal in the Powder River Basin would remain unavailable for leasing.

74.    In the Draft SEIS and Potential RMPA, BLM stated that it supported a dual preferred alternative (Alternative A and Alternative C). 88 Fed. Reg. at 29692. This means that it thought either Alternative A (No Leasing) or Alternative C (Limited Leasing) would achieve the agency's objectives.

75.    After BLM issued the Draft SEIS and Potential RMPA, the public had an opportunity to comment. Many commenters expressed serious concerns about the No Leasing Alternative. *See* Buffalo Final SEIS and Proposed RMPA, BLM, Table H-1 (May 2024), (available in BLM docket at https://eplanning.blm.gov/eplanning-ui/project/2021239/570).

76.     In May 2024, after the public submitted the comments and concerns, BLM issued a notice in the Federal Register that the Proposed RMPA and Final SEIS were available for review. 89 Fed. Reg. 43431 (May 17, 2024). The agency made the Proposed RMPA and Final SEIS available online on BLM's ePlanning project website (available at https://eplanning.blm.gov/eplanning-ui/project/2021239/570). *See* Buffalo Final SEIS and Proposed RMPA.

77.     The Proposed RMPA and FSEIS included the FSEIS and a high-level description of the agency's proposed course of action in the FSEIS, but it did not contain the actual language of the RMPA.

78.     This differs from past practice. Historically, BLM has made available draft language to proposed RMPAs, consistent with its own regulations. *See* 43 C.F.R. § 1610.4-7; *see also* BLM Land Use Planning Handbook H-1601-1, Appendix E; id. at III.A.10; *see also*, *e.g.*, Converse County Oil and Gas Project and RMP Amendment, Appendix G, Proposed RMP Appendices (July 30, 2020). But here, BLM did not release or share proposed language it intended to adopt for the No Leasing Alternative.

79.     In the FSEIS, BLM changed course from a dual preferred alternative and stated that it preferred Alternative A, which would eliminate future coal leasing in the Powder River Basin. 89 Fed. Reg. at 43432.

80.     In the FSEIS, BLM explained the coal screen for each of the proposed alternatives.

81.     Screen 1 considered which lands have development potential. Because it simply identifies the total area with coal development potential, Screen 1 is the same under all three proposed alternatives. It showed that 52.66 billion short tons of coal (out of 61.30 billion short

tons of coal, *see* Screen 1) exist with development potential. Buffalo Final SEIS and Proposed RMPA at ES-6.

82.     Screen 2 considered which land is unsuitable for development. Like Screen 1, Screen 2 was the same under all three proposed alternatives—it merely identifies what land has development potential under Screen 1 but is nevertheless unsuitable for coal mining. Under Screen 2, BLM excluded only 940 acres of the total 481,000 acres in the potential coal development area. Buffalo Final SEIS and Proposed RMPA at A-7.

83.     Screen 3 was where the analysis between the three alternatives varied. BLM varied each of the alternatives by "refining the multiple-use coal screen (Screen 3) to consider greenhouse gas emissions as a nexus for climate change." Buffalo Final SEIS and Proposed RMPA at ES-6. In other words, each alternative considered greenhouse gas emissions to a different extent.

84.     For the No Leasing Alternative, under Screen 3, BLM concluded that none of the coal suitable for coal mining (48.12 billion short tons) would pass Screen 3's multiple-use requirement. Buffalo Final SEIS and Proposed RMPA at ES-6. This means that even though the land has development potential (Screen 1) and is suitable for development (Screen 2), the coal cannot be mined because it does not meet Screen 3's multiple-use requirement when prioritizing a reduction in greenhouse gas emissions to the maximum extent possible. Even though BLM's multiple-use and sustained-yield mandate requires BLM to balance "public lands and their resource" values, 43 U.S.C. §§ 1701-02, BLM explained that under Alternative A's version of Screen 3, the land would be unsuitable for leasing if BLM seeks to "reduce greenhouse gas (GHG) emissions as a proxy for climate change." Buffalo Final SEIS and Proposed RMPA at ES-6. BLM did not explain which "resource value" relates to greenhouse

gas emissions or climate change. 43 U.S.C. § 1702(c). BLM also failed to explain how its focus on greenhouse gas emissions outweighed all the other resource values it is supposed to consider under the multiple-use mandate. *Id.* Notably, this criterion also presumed (without any underlying analysis) both that all coal withheld would have been combusted if not withheld (i.e., that withholding it from market would avoid emissions), and that there would be no alternative coal combusted in the absence of such withheld coal.

85.     The Buffalo Final SEIS and Proposed RMPA proposed to select Alternative A (no-leasing), providing only one rationale for selection of Alternative A and its screening analysis over the other alternatives: "the mines have sufficient federal coal leased to meet forecasted production levels into 2041." Buffalo Final SEIS and Proposed RMPA at ES-6; *id.* at 2-5.  In other words, BLM claimed that there was a lack of future demand for coal, flying in the face of the facts that the RMPA would deny pending applications for Spring Creek, and that the agency's NEPA analysis necessarily assumed that a leasing ban would prevent coal from being combusted as compared to a scenario that did not ban all prospective leases.

86.     The protest period follows publication of the proposed RMPA and FSEIS in the Federal Register and allows interested parties to provide feedback on the proposed plan. The protest period is open to any entity that has an interest in or may be adversely affected by the plan. 43 C.F.R. § 1610.5-2. Whereas the scoping process purports to allow the public to provide feedback on potential issues before BLM releases the draft SEIS, the protest period is supposed to allow public feedback after the final SEIS.

87.     The following parties filed protests to the proposed RMPA following the release of the proposed RMPA and FSEIS: Wyoming Department of Environmental Quality, National Mining Association, Navajo Transitional Energy Company, Navajo Transitional

Energy Company, Senator Daines, Wyoming County Commissioners Association, Campbell County Board of Commissioners, Converse County Board of Commissioners, and Johnson County Board of Commissioners.

88.    On September 20, 2024, BLM Headquarters quietly published the Director's Protest Resolution Report for the Buffalo Field Office SEIS and RMPA.

89.    Upon information and belief, this report was originally available online on or around September 20, 2024, but it was removed at some point in early October, at which point the report was inaccessible.

90.    On November 13, 2024, BLM Headquarters quietly republished the Director's Protest Resolution Report for the Buffalo Field Office SEIS and RMPA. Buffalo Protest Resolution Report, BLM    (Nov. 13, 2024),    https://eplanning.blm.gov/public_pro-jects/2021239/200533937/20123420/251023400/Buffalo%20FSEIS%20PRMPA%20Protest%20Report.pdf.

91.    The November 13 version appears to be identical in every way to the September 20 version, except for the date.

92.    In this report, BLM rejected all the arguments in the protests and states that "no changes to the Buffalo FSEIS/PRMPA were necessary." Buffalo Protest Resolution Report at 1; *see also* Buffalo Record of Decision and Approved RMPA, BLM, 1-6 (Nov. 27, 2024), https://eplanning.blm.gov/eplanning-ui/project/2021239/570 ("The BLM Assistant Director for Resources and Planning resolved the protests without making changes to the Proposed RMP Amendment.").

93.    On November 27, 2024, BLM issued its Record of Decision (ROD) with the Approved RMPA. Buffalo Record of Decision and Approved RMPA, BLM (Nov. 27, 2024), https://eplanning.blm.gov/eplanning-ui/project/2021239/570.

94.    The ARMPA adopted the No Leasing Alternative. This will effectively cause new coal leasing—even of maintenance areas—to cease immediately.

95.    In the final ARMPA, BLM continued to assert that the rationale for selecting the no-leasing alternative was "lack of demand" for future coal. *See* Buffalo ROD at 1-2.

96.    But BLM also revealed the real reason the agency banned leases, as opposed to the demand and necessity-based rationale actually relied on in the proposal. BLM boasted in the introduction to the ROD that: "The Approved RMP Amendment makes 48.12 billion short tons of coal unavailable for leasing consideration in order to reduce greenhouse gas (GHG) emissions as a proxy for climate change" *See* Buffalo ROD at 1-1. BLM further noted that this decision was driven by various executive orders about climate change and the Biden administration's policy objective of eliminating all carbon emissions by 2050, including by forcing a rapid shift to 100% carbon-free electricity by 2035. *See id.* at 1-2 (citing the Whitehouse's November 2021 policy statement on "Pathways to Net-Zero Greenhouse Gas Emissions by 2050," available at https://www.whitehouse.gov/wp-content/uploads/2021/10/us-long-term-strategy.pdf). BLM likewise admitted that selection of the no-leasing alternative was designed to encourage the phase out of reliance on coal in favor of "alternative technologies." Buffalo Protest Resolution Report at 12. The agency likewise asserted (without citation to any statutory basis) that it possessed "control over emissions as they relate to climate change . . . to the extent that GHG emissions are attributable to the full life cycle of fossil fuel extracted from the Federal mineral estate." *Id.*

97.    Notably, BLM's new rationale directly contradicted (without explanation or acknowledgement) BLM's record rationale of a lack of demand for future coal, because GHG emissions can only be reduced if there would in fact be future demand leading to combustion of additional coal in the absence of a prospective leasing ban. In any case, neither rationale justifies BLM's decision to end new coal leasing altogether.

98.    The decision ignores that the land has substantial development potential (Screen 1) and very little of the land is unsuitable for development (Screen 2). Buffalo ARMPA at A-9. It further ignores the results of Screen 4, which confirmed "[t]here is no significant opposition to mining in the areas" by surface owners of the land. Buffalo ARMPA at A-8.

99.    This decision is inconsistent with FLPMA, NEPA, SMCRA, the MLA, and federal regulations governing the resource management planning process.

**Development of the Miles City ARMPA Challenged in this Case**

100.    BLM published its NOI for the Miles City Draft SEIS/Potential RMPA on October 3, 2022. 87 Fed. Reg. 59818.

101.    The Miles City Field office held only one public meeting in connection with its resource management planning process for the Miles City RMP. That occurred in Miles City, Montana, on October 18, 2022.

102.    In December 2022, the Miles City Field Office issued its Final Scoping Report, which summarizes the public input gathered during the scoping period and identifies potential issues that need to be analyzed further.

103.    In May 2023, the Miles City Field Office issued a Draft SEIS and Potential RMPA (Draft SEIS/RMPA). 88 Fed. Reg. 29689 (May 8, 2023) (docket available at https://eplanning.blm.gov/eplanning-ui/project/2021155/570).

104.    In the Miles City Field Office Draft SEIS/RMPA, BLM considered four alternatives to determine the suitability of coal leasing on roughly 1.745 million acres of BLM-administered federal coal in the decision area. Miles City Draft SEIS/RMPA, App. A, at A-1–A-2.

105.    Alternative A, which BLM labeled as the No Action Alternative, carried forward the alternative that had previously been selected in the vacated 2019 ROD, which closed all except 1,214,380 acres, which were still left open as suitable for further consideration for coal leasing. *Id*. Table ES-1, at ES-4.

106.    Alternative B was one approach to Limited Leasing, which eliminated all but 57,940 acres for further consideration for coal leasing. *Id*.

107.    Alternative C was another approach to Limited Leasing, which eliminated all but 810 acres for further consideration for coal leasing. *Id*.

108.    Alternative D was the No Leasing Alternative, which would not allow BLM to consider any new coal leasing applications. *Id*. In other words, it eliminates all future coal leasing in the Powder River Basin.

109.    In the Miles City's Draft SEIS/RMPA, BLM said it supported a co-preferred alternative (Alternative B and Alternative D), which means that it thought either Alternative B (Limited Leasing) or Alternative D (No Leasing) would achieve the agency's objectives. *Id.* at ES-5.

110.    After BLM issued the Draft SEIS and Potential RMPA, the public had an opportunity to comment. Many commenters expressed serious concerns about the No Leasing Alternative. *See* Miles City Final SEIS and Proposed RMPA (Miles City Final SEIS/Proposed RMPA), App. F, Table F-1 (May 2024) (available at https://eplanning.blm.gov/eplanning-ui/project/2021155/570).

111.    In May 2024, after public comment, BLM issued a notice in the federal register that the Final SEIS and Proposed RMPA were available for review. 89 Fed. Reg. 43432 (May 17, 2024). BLM made the document available on its ePlanning project website. *See* Miles City Final SEIS/Proposed RMPA (available at https://eplanning.blm.gov/eplanning-ui/project/2021155/570).

112.    In the Final SEIS/Proposed RMPA, BLM changed course from a co-preferred alternative and said that it preferred Alternative D, which would eliminate future federal coal leasing in the Powder River Basin. *See id*. at ES-5.

113.    Screen 1 considers which lands have coal development potential. It showed that there are approximately 11.7 million acres of BLM-administered federal coal in the decision area, of which 1.745 million acres were carried forward under Screen 1 for all considered alternatives. *See id*. App. A, at A-3; see also id. Ch.2, Table 2-1; 2-3; 2-4; 2-6.

114.    Screen 2 considers which land is unsuitable for development. Under Screen 2, the alternatives excluded the following number of acres as unsuitable for all methods of coal mining without exception: Alternative A (190,590 acres); Alternative B (202,320 acres); Alternative C (202,320 acres); and Alternative D (202,325 acres). *Id.* Ch.2, Table 2-1; 2-3; 2-4; 2-6.

115.    Screen 3 conducts a multiple-use conflict analysis, and land with coal development potential may be eliminated from further consideration for leasing where multiple uses conflict. Under Screen 3, the alternatives excluded the following number of acres based on multiple-use conflicts: Alternative A (193,910 acres); Alternative B (1,671,040 acres); Alternative C (1,744,240 acres); and Alternative D (1,745,040 acres). *Id.* Ch.2, Table 2-1; 2-3; 2-4; 2-6.

116.    Even though BLM's multiple-use mandate requires it to balance "public lands and their resource values," BLM explained that the lands evaluated under Alternative B, C, and D were unsuitable for leasing based on "the climate change criterion for air resources," which it made progressively stricter under each alternative. *See id.* at ES-4–ES-5. BLM did not explain which "resource value"—that FLPMA requires the agency to consider when evaluating multiple-use objectives—relates to greenhouse gas emissions or climate change. 43 U.S.C. § 1702(c). Nor did BLM explain how it made this multiple-use assessment without considering the actual resources identified by FLPMA. 43 U.S.C. § 1702(c). The agency should have relied on resources identified expressly by FLPMA itself. Notably, this criterion presumed (without underlying analysis or rationale) both that all coal withheld would have been combusted if not withheld (i.e., that withholding it from market would avoid emissions), and that there would be no alternative coal combusted in the absence of the withheld coal.

117.    Under Screen 3, the multiple-use screen, BLM excluded between 1,661,530 acres (95.2%) and 1,745,040 acres (100%) from consideration for future coal leasing under Alternatives B, C, and D. Miles City Final SEIS and Proposed RMPA, at A-6. While these exclusions were made based on air resource values, *see id.*, BLM failed to explain how it made a resource assessment concluding that no federal coal is suitable for leasing. Rather, it simply

says that excluding all "1,745,040 acres of BLM administered coal from further consideration" was necessary under these alternatives "to reduce greenhouse gas (GHG) emissions as a proxy for climate change." Miles City ARMPA, at 1-4.

118.    Screen 4 requires consultation with qualified surface landowners, and land with coal development potential may be eliminated from further consideration for leasing based on qualified surface owner preference. Under Screen 4, the alternatives excluded the following number of acres: Alternative A (236,630 acres); Alternative B (820 acres); Alternative C (820 acres); and Alternative D (820 acres). *Id.* Ch.2, Table 2-1; 2-3; 2-4; 2-6.

119.    After applying the screens, the alternatives provided that the following number of acres were acceptable for future coal leasing and development: Alternative A (1,214,380 acres); Alternative B (69,310 acres); Alternative C (810 acres); and Alternative D (0 acres). *Id.* Ch.2, Table 2-1; 2- 3; 2-4; 2-6.

120.    The protest period follows publication of the Final SEIS and Proposed RMPA in the Federal Register and allows interested parties to provide feedback on the proposed plan. The protest period is open to any entity that has an interest in or may be adversely affected by the plan. 43 C.F.R. §1610.5-2. While the scoping process purports to allow the public to provide feedback on potential issues before BLM releases the draft SEIS, the protest period is supposed to allow public feedback after the final SEIS.

121.    The following parties filed protests to the Proposed RMPA: Westmoreland Mining LLC, Montana Coal Council, Landmark Resource Firm, Montana Natural Resource Coalition of Counties, Montana DNRC, National Mining Association, Navajo Transitional Energy Company, and Senator Steve Daines.

122.    On November 13, 2024, BLM published the Director's Protest Resolution Report for the Miles City Field Office Final SEIS and Proposed RMPA. *See* Miles City Protest Resolution Report (Nov. 13, 2024) (available at https://eplanning.blm.gov/eplanning-ui/project/2021155/570).

123.    In this report, BLM rejected all the arguments in the protests and stated that "no changes to the Miles City FSEIS/PRMPA were necessary." *Id.* at 1.

124.    On November 27, 2024, BLM issued the Miles City ARMPA. *See* 89 Fed. Reg. 93650 (Nov. 27, 2024). The Miles City ARMPA acknowledges that the Miles City Field Office area contains 1,745,040 acres of BLM administered land in the decision area with coal development potential. Miles ARMPA, at 1-4. Nevertheless, the Miles City ARPMA adopted Alternative D (the No Leasing Alternative) without any change from the Final SEIS/Proposed RMPA. *See* Miles City AMPRA, at 1-4 (available at https://eplanning.blm.gov/eplanning-ui/project/2021155/570). This will effectively cause new coal leasing—even of maintenance areas—to cease immediately.

125.    In the proposed ARMPA, the *only* rationale provided for selection of a no-leasing alternative was that the BLM determined "additional leasing of federal coal was not necessary based on the current analysis in the Final SEIS. The Analysis indicates that operating mines in the planning area have existing leases with sufficient coal reserves…" *See* Proposed RMPA at 2-17. In other words, BLM claimed that there was no future demand for additional coal, flying in the face of the facts that the RMPA would deny pending applications for Spring Creek, and that the agency's NEPA analysis expressly assumed that a leasing ban would prevent coal from being combusted as compared to a scenario that did not ban all prospective leases.

126.    In response to protests, BLM relied on the same sole rationale. Protesters noted that a ban on coal leasing in the Powder River Basin was inconsistent with FLPMA's multiple use mandate, BLM responded that "all alternatives considered…provide an appropriate balance of uses on public lands" but that the no-lease alternative had been selected because "additional leasing of federal coal was not necessary based on the current analysis in the Miles City FSEIS/PRMPA. The Analysis indicates that operating mines in the planning area have existing leases with sufficient coal reserves…" *See* Miles City Protest Resolution Report at 17-18.

127.    In the final ARMPA, in addition to continuing to claim that no further leasing was necessary based on lack of future coal demand, *see* ROD at 1-5, BLM tipped its hand to the real reason the agency banned leases, as opposed to the demand-based rationale actually relied on in the proposal and protest resolution reports. BLM boasted in the introduction to the ROD that: "The Approved RMP Amendment makes unavailable 1,745,040 acres of BLM administered coal from further consideration for leasing in order to reduce greenhouse gas (GHG) emissions as a proxy for climate change." *See* ROD at 1-4. BLM further noted that this decision was driven by various executive orders about climate change and the Biden administration's policy objective of eliminating all carbon emissions by 2050, including by forcing a rapid shift to 100% carbon-free electricity by 2035. *See* Miles City ROD at 1-5 (citing the Whitehouse's November 2021 policy statement on "Pathways to Net-Zero Greenhouse Gas Emissions by 2050," available at https://www.whitehouse.gov/wp-content/uploads/2021/10/us-long-term-strategy.pdf). Notably, this rationale directly contradicted (without explanation or acknowledgement) BLM's record rationale of a lack of demand for future coal because GHG emissions can only be reduced by the selection of the

No-Leasing alternative if there would in fact be future demand leading to combustion of additional coal in the absence of a prospective leasing ban. In any case, neither rationale justifies BLM's decision to end new coal leasing altogether.

128.   The Miles City ARMPA repeated the same errors from the Final SEIS and Proposed RMPA.

129.   This decision is inconsistent with the MLA, FLPMA, SMCRA, NEPA, and federal regulations governing the resource management plan process.

130.   The Buffalo and Miles City ARMPAs are also arbitrarily inconsistent with the proposed RMPA and FEIS that BLM previously issued for the North Dakota Resource Management Plan. The prior North Dakota RMP proposal identified Alternative B (a limited leasing option) as the preferred alternative. Alternative B would only "close low oil and gas development potential areas and State-designated drinking water source protection areas" to coal leasing. 89 Fed. Reg. 65391, 65392 (Aug. 9, 2024). In other words, coal development is permissible in North Dakota, but it is not permissible in Wyoming or Montana, allegedly because of climate change concerns that would be applicable to all those states. The Miles City and Buffalo ARMPAs also marked a notable departure from BLM's prior decisions in Wyoming and Montana and confirmed BLM's internal inconsistencies in evaluating and considering coal leasing.

131.   Westmoreland has a direct financial stake in federal coal leasing on land withdrawn under the ARMPAs, which is necessary for the continued operation of its Rosebud mine, which in turn is necessary for continued operation of the Colstrip Power Plant.

132.   The ARMPAs will cause a substantial loss of revenue to Westmoreland, threaten premature closure of its existing operations, threaten devastating impacts to the local

Colstrip community, Montana, and all those that rely on the Colstrip Power Plant, and prevents beneficial expansions of mining by Westmoreland in both Montana and Wyoming.

## CLAIMS FOR RELIEF

### Count I

### The Records of Decision and ARMPAs constitute
### a de facto withdrawal in violation of FLPMA.
### (5 U.S.C. §706)

133.    Westmoreland repeats and incorporates by reference each of the Petition's allegations stated above.

134.    A withdrawal or suspension of mineral leasing falls within FLPMA's definition of a "withdrawal." *Mountain States Legal Found. v. Hodel*, 668 F. Supp. 1466, 1474 (D. Wyo. 1987). The No Leasing Alternative jointly selected by BLM's offices constitutes a withdrawal because it removes the Powder River Basin from the operation of laws that otherwise authorize coal leasing.

135.    Congress set forth the procedures for making withdrawals in 43 U.S.C. § 1714.

136.    The Secretary alone is authorized to make withdrawals, or the Secretary may delegate withdrawal authority to individuals in the Office of the Secretary who have been appointed by the President, by and with the advice and consent of the Senate. 43 U.S.C. § 1714(a). Here, the withdrawals were made by the State Directors of Wyoming and Montana-Dakotas, who are not nominated by the President.

137.    The Secretary must publish a notice in the Federal Register that a proposal has been made to withdraw lands. 43 U.S.C. § 1714(b). Here, the withdrawals were incorporated into the Buffalo and Miles City ARMPAs, and the Secretary never published a notice of withdrawal.

138.    The Secretary must hold a public hearing before promulgating a withdrawal. 43 U.S.C. § 1714(h). The Secretary did not hold a hearing on the withdrawal of these lands.

139.    Any withdrawal over 5,000 acres can only be withdrawn for a "period of not more than twenty years." 43 U.S.C. § 1714(c)(1). Since no new coal lease applications would be accepted, coal production in the Powder River Basin would end in 2041. The withdrawal of this land would therefore extend more than twenty years.

140.    The Secretary must notify both Houses of Congress of a withdrawal of over 5,000 acres. 43 U.S.C. § 1714(c). The Secretary notified neither the House nor the Senate.

141.    Because BLM failed to comply with the requirements of 43 U.S.C. § 1714, both the Buffalo and the Miles City ARMPAs are unlawful because they are not in accordance with law. 5 U.S.C. §706(2).

## Count II
### The Records of Decision and ARMPAs violate FLPMA's multiple use mandate.
### (5 U.S.C. §706)

142.    Westmoreland repeats and incorporates by reference each of the Petition's allegations stated above.

143.    FLPMA mandates that BLM "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a); 43 U.S.C. § 1712(c)(1). To meet this obligation, BLM must consider "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(c).

144.    Removing all areas within the jurisdiction of BLM's Miles City and Buffalo Field Offices from federal coal leasing does not satisfy FLPMA's multiple use mandate, and

it ignores FLPMA's order to consider "renewable and nonrenewable resources, including …

minerals." 43 U.S.C. §1712(c).

145.    Because "FLPMA prohibits only unnecessary or undue degradation, not all

degradation," BLM must ensure that regulatory measures do not categorically prevent use of

resources on federal lands, including the extraction of federal minerals. *Theodore Roosevelt*

*Conservation P'ship v. Salazar*, 661 F.3d 66, 78 (D.C. Cir. 2011); s*ee also W. Watersheds Project v.*

*Bureau of Land Mgmt.*, 721 F.3d 1264, 1276 (10th Cir. 2013).

146.    FLPMA does not identify climate change or greenhouse gas emissions as

resources that need to be balanced under FLPMA's multiple use mandate. Yet BLM

*categorically* elevated these considerations above the resource values expressly identified in

FLPMA.

147.    Because BLM failed to comply with FLPMA's multiple use mandate, both the

Buffalo and the Miles City ARMPAs are unlawful because they are not in accordance with

the law. 5 U.S.C. §706(2).

### Count III

### The Records of Decision and ARMPAs violate the Mineral Leasing Act.
### (5 U.S.C. §706)

148.    Westmoreland repeats and incorporates by reference each of the Petition's

allegations stated above.

149.    The MLA directs the Secretary of the Interior to take actions "necessary to

carry out and accomplish the purposes of this chapter." 30 U.S.C. § 189. Congress' purpose

in enacting the MLA was "[t]o promote the mining of coal, phosphate, oil, oil shale, and

sodium on the public domain." Act of Feb. 25, 1920, ch. 85, § 32, 41 Stat. 437. Congress

further mandated: "Deposits of coal, phosphate, sodium, potassium, oil, oil shale, gilsonite

(including all vein-type solid hydrocarbons), or gas, and lands containing such deposits owned by the United States . . . *shall be subject to disposition* in the form and manner provided by this chapter to citizens of the United States, or to associations of such citizens, or to any corporation organized under the laws of the United States . . . ." 30 U.S.C. § 181 (emphasis added).

150.    Congress has determined that it is "in the national interest to foster and encourage private enterprise in," among other endeavors, "the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs." Mining & Minerals Policy Act of 1970, 30 U.S.C. § 21a. Congress has instructed that "[i]t shall be the responsibility of the Secretary of the Interior to carry out this policy when exercising [her] authority under such programs as may be authorized by law." *Id.*

151.    The Secretary lacks authority to implement decisions under the MLA and FLPMA that do not, among other features, promote the development of coal and other minerals on the public domain.

152.    The ARMPAs are inconsistent with BLM's statutory responsibility to ensure that the development of domestic mineral resources is efficient, expedient, and economic.

153.    Both the Buffalo and the Miles City ARMPAs are unlawful because they are not in accordance with the law, abuse the Secretary's discretion, and exceed the Secretary's authority. 5 U.S.C. §706(2).

## Count IV

### The Records of Decision and ARMPAs violate SMCRA.
### (30 U.S.C. § 1272(d))

154.    Westmoreland repeats and incorporates by reference each of the Petition's allegations stated above.

155.    The Surface Mining Control and Reclamation Act of 1977 requires that prior to designating a land area as unsuitable for surface coal mining operations, the regulatory authority must prepare a detailed statement on (i) the potential coal resources of the area, (ii) the demand for coal resources, and (iii) the impact of such designation on the environment, the economy, and the supply of coal. 30 U.S.C. § 1272(d).

156.    The ARMPAs cursory analysis does not meet the requirements of the detailed statement necessary before designating a land area as unsuitable for surface coal mining operations under SMCRA, because BLM fails to: sufficiently forecast future demand for coal in both the United States and elsewhere; discuss how the selected leasing ban may impact the United States' ability to meet domestic demand for coal and the reliability of the national electrical grid or other impacts to energy pricing or availability; or analyze potential environmental impacts associated with use of alternative sources of coal without the characteristics of Powder River Basin coal.

157.    Both the Buffalo and the Miles City ARMPAs are unlawful because they are arbitrary and capricious and contrary to law. 5 U.S.C. §706(2).

## Count V

### The Records of Decision and ARMPAs violate the FRA.
### (43 U.S.C. § 4336a)

158.    Westmoreland repeats and incorporates by reference each of the Petition's allegations stated above.

159.    In June 2023, Congress passed the Fiscal Responsibility Act. Public Law No. 118-5 (June 3, 2023). Among other NEPA reforms, Congress mandated that an EIS cannot exceed 150 pages, excluding citations and appendices, unless the agency makes a determination that the subject matter studied is of extraordinary complexity. 43 U.S.C. § 4336a.

160.    On May 17, 2024, almost a year after the Fiscal Responsibility Act became law, BLM issued notices in the Federal Register of the Final SEIS for both the Buffalo and Miles City field offices. The Miles City SEIS/RMPA contained at least 213 pages—with approximately 400 additional pages in references and appendices. The Buffalo SEIS/RMPA contained at least 186 pages—with well over 400 additional pages in references and appendices. BLM never determined that the subject matter was of any level of abnormal complexity. The ARMPAs thus each violated the Fiscal Responsibility Act.

161.    The Buffalo and Miles City ARMPAs are unlawful because they are contrary to law. 5 U.S.C. § 706(2).

## Count VI

### The Records of Decision and ARMPAs violate the BLM's Resource Management Planning Regulations.
### (5 U.S.C. §706)

162.    Westmoreland repeats and incorporates by reference each of the Petition's allegations stated above.

163.    BLM's Resource Management Planning Regulations require that approval of an ARMPA "shall be withheld on any portion of a plan or amendment being protested" until the Director has promptly rendered a decision on all the protests, provided in writing and setting forth all reasons for the decision. 43 C.F.R. § 1610.5-2(a)(3); *see also* 43 C.F.R. § 1610.5-1(b).

164.    Although Westmoreland received a letter purporting to deny its protests, not every objection was responded to prior to issuing the Record of Decision. Notably, BLM failed to respond to Westmoreland's protests that the Miles City SEIS/RMPA violated the Mineral Leasing Act, and the Fiscal Responsibility Act.

165.    The Miles City ARMPA is unlawful because it is not in accordance with the law. 5 U.S.C. § 706(2).

## Count VII

### The Records of Decision and ARMPAs violated NEPA.
### (5 U.S.C. § 706)

166.    Westmoreland repeats and incorporates by reference each of the Petition's allegations stated above.

167.    NEPA requires that one of the alternatives considered be a "no-action" alternative. The ARMPAs violated this fundamental requirement by failing to even consider any alternative that allowed the same leasing as allowed prior to the ARMPAs—i.e., every single alternative considered would have removes additional land from coal leasing compared to the then existing status-quo.

168.    The alternative that BLM misrepresented as a "no-action alternative" did not in fact represent "no-action" compared to the status quo, but simply mirrored the proposed coal leasing restrictions from the 2019 ROD previously vacated by a prior court decision. *See W. Org. of Res. Councils v. BLM*, No. 4:20-cv-00076-GF-BMM (D. Mont. Aug. 3, 2022) (expressly denying BLM's motion to remand without vacatur). By contrast, that same court decided not to vacate the 2015 ROD. Thus BLM was required to consider the alternative selected in the 2015 ROD as the "no-action" alternative under NEPA.

169.    BLM also failed to consider an adequate range of alternatives. *Muckleshoot Indian Tribe*, 177 F.3d at 813. Although the (misnamed) No Action Alternative in the Buffalo ARMPA would make 48.01 billion short tons of coal available for leasing, the Limited Leasing Alternative only makes 1.24 billion short tons of coal available—only slightly more than the No Leasing Alternative makes available. Likewise, in the Miles City ARMPA, the (misnamed) No Action Alternative would leave 1,214,380 acres available for future coal leasing, while the Limited Leasing Alternatives—Alternatives B and C—would only make available 69,310 acres and 810 acres, respectively. Both alternatives would only make slightly more acreage available for federal coal leasing than the No Leasing Alternative. Miles City Final SEIS and Proposed RMPA, at ES-4.

170.    Both the Buffalo and the Miles City ARMPAs are unlawful because they are not in accordance with the law. 5 U.S.C. § 706(2).

## Count VIII

### The Records of Decision and ARMPAs are arbitrary and capricious.
### (5 U.S.C. §706)

171.    Westmoreland repeats and incorporates by reference each of the Petition's allegations stated above.

172.    The "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

173.    An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

174.    An agency decision is arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.*

175.    An agency action is arbitrary and capricious if it departs from prior policy without sufficient justification. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

176.    An agency action is arbitrary and capricious if it is based on "an internally inconsistent analysis." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015).

177.    An agency action is arbitrary and capricious if the rationale offered in the record is pretextual or contrived, regardless of whether the agency would otherwise have authority to take an action. *Dep't of Commerce v. New York*, 588 U.S. 752 (2019).

178.    An agency action is arbitrary and capricious if it wrongly relies on lack of agency discretion. *See Prill v. N.L.R.B*, 755 F.2d 941, 942 (D.C. Cir. 1985).

179.    An agency action is arbitrary and capricious if it relies on substantial uncertainty as a justification for its actions, without explaining why such uncertainty supports the chosen approach. *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011).

180.    BLM's ARMPAs are arbitrary and capricious because they are unreasonable, internally inconsistent, fail to take into account important aspects of the problem, depart from its prior policy without sufficient justification, fail to articulate a rational connection between the evidence and the action taken, rely on unexplained uncertainties, erroneously rely on lack

of discretion, and either relied on factors Congress did not intend the agency to consider or are pretextual.

181.    *First,* BLM's rationale in the ARMPAs and the EISs on which they relied were arbitrarily internally inconsistent, on the one hand claiming that a no-lease alternative avoids the downstream combustion related emissions, yet on the other hand claiming that the rule would not impact energy demands. This self-contradictory two-step resulted from BLM ignoring that either alternative coal will be combusted (in which case there is no avoided downstream emissions, and perhaps instead increased emissions—e.g., due to coal with higher sulfur content, such that it is arbitrary to include "avoided" emissions as part of the multiuse screening in the SEIS)—OR alternative coal will not be combusted (in which case the energy otherwise generated by that coal is necessarily also not generated, which in turn would require BLM to perform an analysis of how such a reduction in available energy generation impacts the energy grid and economy as compared to a no-change alternative and other alternatives under consideration, which BLM has not done).

182.    *Second*, the BLM's selection of a no-lease alternative was not rationally related to the evidence before the agency. The specific reason that BLM proposed to choose a leasing ban over other alternatives was that additional leasing was not necessary because the existing mines purportedly had sufficient reserves. And BLM repeated that same rationale for denying protests and in the record of decision. But this rationale lacked any reasonable relationship to the record given that the selected alternative denied pending leases and would admittedly lead to premature shutdown of mining operations in the Powder River Basin.

183.    *Third*, The ARMPAs are arbitrary and capricious because the rationale in the record and in response to protests pretextually claims to be based on a lack of demand for coal

mining, when in reality the BLM enacted the ARMPAs as part of an effort to do what Congress has not authorized BLM to accomplish directly: limiting coal production in order to reduce coal consumption.

184.    *Fourth*, BLM failed to consider the devastating impacts that this withdrawal and accompanying risk of premature closure or curtailment of operations at mines in the region will have on the communities supported by these mines, the power plants they support, and the states in which they are located. These economic costs to the states of Montana and Wyoming and its citizens, including local environmental justice communities, are critical considerations that BLM failed to analyze and that, once considered, would not allow BLM to reasonably or rationally finalize the ARMPAs that threaten premature future closure of Rosebud and Colstrip, or at minimum, deprive them of options for continued operation if issues are encountered at existing leases that would necessitate expansion or substitution of different mining areas.

185.    *Fifth*, BLM's action is unreasoned because it relied on uncertainty to avoid considering the impact the withdrawal of this uniquely cost effective and low-sulfur coal will have on the electric grid, including reliability, resource adequacy, ability to meet other environmental laws, and national security, economic, and environmental implications of dependence on foreign coal replacements.

186.    *Sixth,* BLM's ARMPAs arbitrarily took multiple unacknowledged and unexplained reversals of its determinations and policies in 2015, including:

a.    In 2015, BLM determined that mineral leasing in the Powder River Basin "best achieves the mix of multiple use." Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain

Region, Dep't of Interior, at 3-15 (Sept. 2015), available at https://eplanning.blm.gov/public_projects/lup/105596/143663/176863/2015_Rocky_Mountain_Region_Record_GRSG_ROD_ARMPA_508.pdf. BLM fails to reasonably explain its departure from prior policy.

b.  BLM's determination that "additional leasing of federal coal is not necessary" was an about face from the 2015 action's express determination to follow BLM's prior practice of making areas available for lease even when not subject to existing or pending leases, and BLM does not provide any explanation for why materially identical facts led to opposite determinations in this case.

c.  BLMs automatic exclusion of all areas near water resources under multiple use screening (including 300 feet buffers from streams, and wetlands, and 100 foot buffer for riparian habitats) under every single alternative considered in the SEIS and ARMPAs was an unexplained and sub-silentio reversal of the 2015 Miles City Approved Resource Management Plan determination that "[s]urface-disturbing activities are allowed in and within 300 feet of the boundary of riparian and wetland areas with approved design features to maintain or improve functionality and resiliency." *See* 2015 RMP at 3-23.

187.  *Seventh*, the agency's decision in the Powder River Basin is arbitrary because the agency recently signaled that it plans to continue leasing coal on federal land in North Dakota. 89 Fed. Reg. 65391, 65392 (Aug. 9, 2024). BLM justified its decision in the Powder River Basin by saying that the No Leasing Alternative would "reduce greenhouse gas

emissions." Buffalo ARMPA at 1-1; Miles City ARMPA at 1-4. But it does not address greenhouse gas emissions as one of the justifications for permitting North Dakota to continue its limited leasing. *See* North Dakota Proposed Resource Management Plan and Final Environmental Impact Statement, BLM, Vol. 1 (July 2024), available at https://eplanning.blm.gov/public_projects/1505069/200366341/20117028/ 251017008/NDRMP_PRMP_FEIS_Vol1_508.pdf; *see also* 89 Fed. Reg. 65391, 65392 (Aug. 9, 2024).

188.    *Eighth*, BLM's action was unreasoned because it wrongly relied on lack of agency discretion based on prior District of Montana court decisions rather than acknowledging that selection between alternatives is an agency act of discretion requiring specifically articulated and rational supporting grounds. *See Prill v. N.L.R.B*, 755 F.2d 941, 942 (D.C. Cir. 1985).

189.    *Ninth*, the agency's decision not to enter into leasing agreements in the Powder River Basin is unreasonable given that the Powder River Basin accounts for 85% of federal coal production and over 40% of all coal produced in the U.S.

190.    *Tenth,* BLM's ARMPAs failed to consider the non-thermal uses of coal, including the production of Rare Earth Elements and other critical minerals.

191.    *Eleventh*, the ARMPAs and the EISs they relied on arbitrarily assess the costs and benefits of the various alternatives under consideration, including by:

d.    Only accounting for indirect costs of coal mining (e.g., potential emissions downstream) without even acknowledging the concomitant indirect positive effects of coal, including cheaper and more dependable energy, both of which also come with positive health effects, and the indirect health

impacts of higher living standards and better healthcare throughout the community benefitting from mining and powerplant operations;

e.  Declining to even attempt to account for negative economic impacts beyond 2038 due to uncertainty yet still accounting for environmental impacts and "avoided" emissions for that exact same extended time period past 2038;

f.  Arbitrarily failing to consider related infrastructure costs that will be caused by the ARMPAs, including costs to replace the coal that BLM assumes will be avoided in its impact analysis, either by establishing mining operations in new locales, or to replace coal in the energy market including having to site and construct new energy production facilities to replace displaced coal power;

g.  Arbitrarily inflating the environmental costs (both climate related and non-climate health impacts) of downstream coal usage by assuming that all coal not mined constitutes "avoided" emissions, ignoring without rationale any substitute emissions from coal alternatively sourced to replace that made unavailable by the RMPAs, which may in many cases result in worse emission profiles than if the coal were sourced from the powder river basin;

h.  Arbitrarily inflating downstream emissions by ignoring the effect of recently enacted rulemakings which reduce particulate matter and GHG emissions associated with coal combustion.

192.  *Twelfth*, the ARMPAs and the EISs they relied on arbitrarily assess environmental justice considerations, giving little weight to economic impacts on

environmental justice populations in favor of purported environmental benefits to those groups (which in turn expressly refused to consider the potential for combustion of lower quality coal in the absence of Powder River Basin coal), and wholly ignoring the potentially devastating cultural impacts that would follow loss of employment, economic, and healthcare benefits in their local communities supported by coal related activities.

193.    *Thirteenth*, BLM's reliance on the Interagency Working Group 2021 Social Cost of Carbon to estimate benefits of the ARMPAs is arbitrary and capricious given the multitude of documented reliability issues with that metric, including the facts that it:

i.    Unreasonably relies on inherently unreliable projections of frequency, scope, and severity of future international conflicts and human migrations for the next 300 years, which cannot serve as a reasoned basis for regulatory prediction;

j.    Arbitrarily relies on only indirect (and attenuated) harms, without any discount for the concomitant indirect benefits of carbon-based fuels including energy production and economic and healthcare benefits;

k.    Unreasonably and unlawfully based cost estimates on global impacts rather than only impacts within the United States. Congress did not authorize BLM or any other agency to weigh global impacts as part of NEPA analysis. Moreover, this arbitrarily departed without explanation from BLM's previous finding that the 2016 estimates on which the IWG 2021 SC-GHG is based "is not appropriate" because "it is intended to model effects on the welfare of future generations on a global scale by additional carbon emissions occurring in the present," "[m]onetizing only certain

effects on social welfare can lead to an unbalanced assessment," and "[r]eporting the SCC in isolation would be misleading." BLM, Record of Decision, WY-060-EA13-147 (Nov. 30, 2017) (regarding West Antelope II South Lease Modification WYW-177903; *see also WildEarth Guardians v. Bernhardt*, 2020 WL 6799068, at *11 (D.N.M. Nov. 19, 2020) (affirming BLM's refusal to use SCC).

194.    *Fourteenth*, BLM arbitrarily prioritized a factor Congress did not instruct BLM to consider (i.e. reductions in downstream greenhouse emissions) over all the factors Congress expressly instructed BLM to consider in FLPMA, MLA, and SMCRA.

195.    Both the Buffalo and the Miles City ARMPAs are unlawful because they are arbitrary and capricious, unreasonable, and fail to consider important aspects of the problem. 5 U.S.C. §706(2).

## Count IX

### The Records of Decision and ARMPAs violate the Due Process Clause of the U.S. Constitution. (U.S. Constitution, Fifth Amendment)

196.    Westmoreland repeats and incorporates by reference each of the Petition's allegations stated above.

197.    Arbitrary and capricious action by governmental agencies that infringe liberty or property interests is a violation of the Fifth Amendment of the United States Constitution.

198.    Westmoreland has both liberty and property interests in the viability of its mining operations.

199.    Because the BLM's actions were arbitrary and capricious, for the reasons stated in Count VIII above, the ARMPAs also violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

**Count X**

**The Records of Decision and ARMPAs violate the Major Questions Doctrine.**
(*West Virginia v. EPA*, 597 U.S. 697 (2022))

200.    Westmoreland repeats and incorporates by reference each of the Petition's allegations stated above.

201.    Executive branch agencies lack authority to resolve major questions of economic and social policy that properly rest with Congress itself, because "[e]ven if Congress has delegated an agency general rulemaking or adjudicatory power, judges presume that Congress does not delegate its authority to settle or amend major social and economic policy decisions." 597 U.S. 697, 730 (2022) (internal quotation marks omitted). In such cases, agencies cannot rely on "vague language" but must instead point to a clear statement from Congress expressly delegating the relevant authority to the agency. *Id*. at 724-25.

202.    The Supreme Court has held that: "Capping carbon dioxide emissions at a level that will force a nationwide transition away from the use of coal to generate electricity" and "the decision of how much coal based generation there should be over the coming decades" are both major questions which require a clear delegation of authority from Congress before an agency may pursue those objectives, and which was not satisfied by general delegations of authority to EPA to regulate air pollution. *West Virginia v. EPA*, 142 S. Ct. 2587 (2022).

203.    The BLM enacted the ARMPAs specifically to cap $CO_2$ emissions, and to force a shift away from coal generation.

204.    Congress has not delegated BLM authority to cap $CO_2$ emissions or to force a shift away from coal generation.

205.    Both the Buffalo and the Miles City ARMPAs are unlawful because they are not in accordance with the law. 5 U.S.C. §706(2).

**PRAYER FOR RELIEF**

206.    Westmoreland respectfully requests that the Court enter judgment for Westmoreland and against Respondents and provide the following relief.

a.    a declaration that the Buffalo Field Office ARMPA is arbitrary and capricious within the meaning of 5 U.S.C. §706;

b.    a declaration that the Miles City Field Office ARMPA is arbitrary and capricious within the meaning of 5 U.S.C. §706;

c.    a declaration that the Buffalo Field Office ARMPA is an abuse of discretion within the meaning of 5 U.S.C. §706;

d.    a declaration that the Miles City Field Office ARMPA is an abuse of discretion within the meaning of 5 U.S.C. §706;

e.    a declaration that the Buffalo Field Office ARMPA is not in accordance with law within the meaning of 5 U.S.C. §706;

f.    a declaration that the Miles City Field Office ARMPA is not in accordance with law within the meaning of 5 U.S.C. §706;

g.    vacatur of the Buffalo and Miles City ARMPAs;

h.    a permanent injunction barring enforcement of the Buffalo and Miles City ARMPAs; and

i.    any other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Alexander K. Obrecht
Alexander K. Obrecht
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, CO 80202-2662

Martin T. Booher
Joshua T. Wilson
BAKER & HOSTETLER LLP
2000 Key Tower
127 Public Square
Cleveland, Ohio 44114

January 31, 2025

*Counsel for Petitioners*